480 S.E.2d 548

**STATE of West Virginia ex rel. Joseph SURIANO, Jr., and the Ohio County Education Association, an Association, Relators,**

v.

**Honorable Martin J. GAUGHAN, Judge of the Circuit Court of Ohio County, and Thomas J. Romano, M.D., Respondents.**

**No. 23555.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 29, 1996.

Decided Dec. 5, 1996.

---

Rebecca A. Baitty, Rebecca A. Baitty, P.A., Sarasota, FL, Sean P. McGinley, DiTrapano & Jackson, Charleston, for Relators.

John Preston Bailey, Alan G. McGonigal, Bailey, Riley, Buch & Harman, L.C., Wheeling, for Respondent Thomas J. Romano, M.D.

CLECKLEY, Justice:

In this original proceeding for a writ of prohibition,[1] the relators, the Ohio County Education Association [hereinafter the

1. The Honorable Arthur M. Recht resigned as Justice of the Supreme Court of Appeals of West Virginia effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing October 15, 1996, and continuing until further order of this Court.

OCEA] and Joseph Suriano, Jr., former president of the OCEA, request that we prohibit the respondent, the Honorable Martin J. Gaughan, Judge of the Circuit Court of Ohio County, from holding further proceedings in the underlying libel action filed by·Thomas J. Romano, M.D. The alleged defamatory statements were contained in a newspaper advertisement and a newspaper article in which the OCEA and then-president Suriano criticized Dr. Romano's withdrawal from West Virginia state insurance programs and other changes in public employees' health benefits occasioned by the Omnibus Health Care Act of 1989. We issued a rule to show cause and now grant the writ of prohibition.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 1989, the West Virginia Legislature enacted the Omnibus Health Care Act of 1989, codified in W. Va.Code,· 16–29D–1 *et seq.* (1989). The relevant part of this Act required physicians and health care providers who provided services to patients having insurance through one of West Virginia's state insurance programs (Public Employees Insurance Agency [hereinafter PEIA],[2] Workers' Compensation, Medicaid, and Division of Rehabilitation Services) to provide services to patients covered by any and all state insurance programs.[3] Prior to the passage of this legislation, physicians were not required to accept "all or none" of the state's insurance programs; rather, medical providers could choose to accept only one or some of these insurance recipients and decline to accept as patients other state insureds.

In the present case, the respondent herein and plaintiff below, Thomas Romano, M.D.,[4] had provided services to state insureds covered by the PEIA and Workers' Compensation state insurance programs. Following the passage of this legislation, however, Dr. Romano determined that he would not provide services to any patient covered by any of West Virginia's four state insurance programs. Consistent with the procedures implemented by PEIA in the wake of this new legislation, Dr. Romano notified PEIA that he was withdrawing from the program and that he would no longer be a participating provider with regard to PEIA insureds.[5] Dr. Romano did, however, obtain authorization from PEIA to continue seeing patients, who were PEIA insureds, on a private basis. Un-

---

**2.** PEIA provides insurance for state employees employed by state departments and divisions participating in this plan.

**3.** W. Va.Code, 16–29D–3 (1989), provides, in relevant part:

"(e) [A]ny health care provider who agrees to deliver health care services to any beneficiary of a health care program of a department or division of the state, including the public employees insurance agency, the state medicaid program, the workers' compensation fund and the division of rehabilitation services, the charges for which shall be paid by or reimbursed by any department or division which participates in a plan or plans as described in this section, shall be deemed to have agreed to provide health care services to the beneficiaries of health care programs of all of the other departments and divisions participating in a plan or plans[.]

\* \* \* \* \* \*

"(h) A health care provider who provides health care services to any beneficiary of a health care program of a department or division of the state pursuant to the plan or plans developed in accordance with this article may withdraw from participation in said plan or plans: Provided, That the health care provider shall provide written notice of withdrawal from participation in said plan or plans to the administrator of the public employees insurance agency: Provided, however, That a provider who has withdrawn from further participation is not required to render services to any beneficiaries under the plan or plans who are not his or her patients at the time the notice of withdrawal is provided and the provider may continue to provide services to his or her preexisting patients for not more than forty-five days after tendering the notice of withdrawal without obligating his or herself to treat such other beneficiaries."

This section has since been repealed, *see* W. Va.Code, 16–29D–3 (1991), to delete the "all or none" provision. However, since this cause of action arose prior to the subsequent statutory amendments, those changes have no effect on the instant case.

**4.** Dr. Romano is board-certified in rheumatology.

**5.** Similarly, Dr. Romano informed the West Virginia Workers' Compensation Commissioner of his intent to cease treatment of workers' compensation claimants.

der this arrangement, these patients would be personally responsible to pay Dr. Romano's treatment fees, and neither Dr. Romano nor the patient would be permitted to submit these claims for reimbursement by PEIA.

Due to the statewide withdrawal of health care providers from participation in state insurance programs occasioned by the Omnibus Health Care Act, PEIA sent a memorandum, dated December 7, 1989, to its insureds listing the withdrawing doctors. This memo also notified state employees of the effective date of these physicians' withdrawals and when their services would no longer be covered by PEIA. Among those physicians listed were Dr. Romano and approximately eleven other physicians practicing in or around Ohio County, West Virginia.

The relators herein, and defendants below, the Ohio County Education Association [hereinafter OCEA] and Joseph Suriano, Jr., then-president of the OCEA, discussed the PEIA memo at the OCEA's regular monthly meeting in December, 1989.[6] Individual members of the OCEA, angered by their perceived exodus of Ohio County physicians from the state insurance programs,[7] determined that they would place an advertisement in two local Wheeling, West Virginia, newspapers, the *Wheeling Intelligencer* and the *Wheeling News Register*, to inform current and retired state employees about the physicians withdrawing from the state insurance programs. The advertisement read as follows:

---

### YOUR CHILDREN'S TEACHERS AND THEIR FAMILIES HAVE BEEN DENIED HEALTH SERVICES BY THESE OHIO VALLEY PHYSICIANS.

| | |
|---|---|
| R. ALAN FAWCETT, M.D. | CATHERINE COLEMAN, M.D. |
| GUS J. MOUHLAS, M.D. | FERNANCO G. GIUSTINI, M.D. |
| J. MICHAEL LAWSON, M.D. | C.V. PORTER, M.D. |
| THOMAS J. ROMANO, M.D., PH.D., FACP | J.W. CAMPBELL, M.D. |
| VILJA K. STEIN, M.D. | T.A. ATHARI, M.D. |
| SAMUEL J. BRACKEN, JR., M.D. | CHANDRA S. SWAMY, M.D. |

DATA PROVIDE [SIC] BY PEIA

---

This advertisement apparently was published three consecutive days, one of which was December 18, 1989.

On December 19, 1989, the *Wheeling News Register* published an article regarding an anticipated rally by the Ohio County teachers and other state employees, planned for that evening, to oppose the Omnibus Health Care Act. The rally was scheduled to coincide with the announcement of changes in PEIA premium rates by Sally Richardson, then-director of PEIA. The article discussed the OCEA advertisement and listed the physicians named therein, noting their particular fields of practice. Additionally, the article

quoted Suriano as saying, " 'Certain public employees need to know who is not treating them now[.] We felt that the teachers needed to know that. Maybe this will shake those doctors up[.] They should honor their professional code. We would not turn away one of their children.' "

In response to the OCEA advertisement and Suriano's comments in the subsequent newspaper article, Dr. Romano wrote to Suriano requesting that he and the OCEA apologize, in writing, to Dr. Romano and retract their statements. Both Suriano and the OCEA refused to rescind their statements.

6. Teachers in Ohio County had the option of either receiving health insurance through PEIA or the Health Plan of the Upper Ohio Valley, a health maintenance organization.

7. The relators indicate that among the twelve Ohio County physicians withdrawing from the state insurance programs, nine were obstetricians and/or gynecologists. The relators further

assert that, in 1989, only fifteen obstetricians and/or gynecologists were practicing in Ohio County, West Virginia. Therefore, the withdrawal of nine such physicians eliminated approximately sixty percent of the previously available specialists in these fields. The record does not indicate whether the remaining six obstetricians and/or gynecologists in Ohio County accepted patients covered by state insurance.

On February 1, 1990, Dr. Romano, through counsel, again requested a written and public apology and a retraction, and again Suriano and the OCEA refused to apologize. Then, on approximately March 27, 1990, Dr. Romano filed a civil action against Suriano and the OCEA, in the Circuit Court of Ohio County, alleging that the newspaper advertisements and Suriano's published comments constituted defamation and libel. Suriano and the OCEA filed a motion to dismiss and a motion for summary judgment, but the circuit court denied both motions on March 10, 1995. Although the relators state that Dr. Romano repeatedly sought a trial date during the three-year pendency of their motions, it seems that Dr. Romano has not attempted to set a trial date or otherwise proceed with this case since its re-assignment to Circuit Judge Martin J. Gaughan following the retirement of Circuit Judge George Spillers in March, 1995. However the relators fear that Dr. Romano may, in fact, attempt to proceed with this matter. Therefore, the relators request this Court to prohibit Circuit Judge Gaughan and Dr. Romano from scheduling this case for trial or otherwise proceeding with this matter.

## II.

### DISCUSSION

Before this Court, the relators Suriano and the OCEA contend that Dr. Romano is a limited purpose public figure and that he cannot prove they acted with "actual malice". The relators maintain further that the newspaper advertisement and quoted statements were not defamatory and did not constitute libel. By contrast, Dr. Romano responds that he is a private individual, not a public figure, and that the relators acted negligently in publishing these statements. Moreover, he submits the relators' advertisement and statements were defamatory and libelous. After a brief discussion of the standard for issuing a writ of prohibition, we will address the relators' issues.

### A.

*Standard for Issuing Writ of Prohibition*

■ Prior to reaching the merits of the relators' contentions, we must first determine whether prohibition is appropriate in the instant case. Generally, we decline to exercise original jurisdiction in cases involving merely factual disputes. *See State ex rel. Doe v. Troisi,* 194 W.Va. 28, 31, 459 S.E.2d 139, 142 (1995); *State v. Lewis,* 188 W.Va. 85, 90 n. 8, 422 S.E.2d 807, 812 n. 8 (1992). We limit our exercise of original jurisdiction because " ' " '[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies.... As extraordinary remedies, they are reserved for really extraordinary causes.' " ' " *State ex rel. United States Fidelity & Guar. Co. v. Canady,* 194 W.Va. 431, 436, 460 S.E.2d 677, 682 (1995), quoting *State ex rel. Doe v. Troisi,* 194 W.Va. at 31, 459 S.E.2d at 142, quoting *Ex parte Collett,* 337 U.S. 55, 72, 69 S.Ct. 944, 953, 93 L.Ed. 1207, 1217 (1949), quoting *Ex parte Fahey,* 332 U.S. 258, 259–60, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041, 2043 (1947).

■ The relators contend that prohibition is appropriate in the present case and quote Syllabus Point 1 of *Long v. Egnor,* 176 W.Va. 628, 346 S.E.2d 778 (1986), in support of their position:

"Prohibition will lie to prohibit a case from proceeding to trial when the remedy of appeal is manifestly inadequate to protect against the chilling effect of allowing a suit to proceed because the complaint, as a matter of constitutional law, contains insufficient allegations to warrant interference with a citizen's right to free speech under the First Amendment to the United States Constitution and Article III, Section 7 of the West Virginia Constitution."

Applying this standard to the facts of the present case, the relators insist that Dr. Romano's complaint is insufficient because it does not allege publication of a provably false assertion of fact which is defamatory of Dr. Romano. Therefore, the relators assert that prohibition is appropriate to prevent the further abridgement of their First Amendment rights to free speech and free expression.

Dr. Romano counters that prohibition is inappropriate in the present case. He maintains that his complaint sufficiently alleges facts that would permit imposing liability on

the relators' speech. He claims the relators' statements in both the newspaper advertisement and the subsequent article were false and injured his professional reputation and relationship with members of the community. Dr. Romano further charges that the facts show that the relators acted either negligently or with actual malice in making these defamatory remarks. As a result, Dr. Romano contends that his case should go forward.

Dr. Romano further complains that prohibition is not appropriate in the instant case because the issues presented are purely factual. This Court has previously stated that "we have refused to exercise original jurisdiction to issue a writ of prohibition when disputes are purely factual[.]" *State ex rel. Doe v. Troisi*, 194 W.Va. at 31, 459 S.E.2d at 142. (Footnote omitted). In the instant case, Dr. Romano contends that factual issues exist as to whether he was a limited purpose public figure and whether the relators acted negligently or with actual malice. In light of these factual disputes, Dr. Romano asserts that prohibition would not be an appropriate remedy.

■ Based upon our prior decisions, *see, e.g., Doe, supra; United States Fidelity & Guar. Co., supra; Long, supra,* we find that prohibition is an appropriate remedy in the instant case because it does not involve solely a factual dispute. The parties raise two issues which can be decided by a court as matters of law: (1) whether Dr. Romano was a private individual or a public figure with regard to the changes in the state medical insurance programs,[8] *see Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir.1994) ("the question of whether a defamation plaintiff is a 'limited-purpose public figure' is an issue of law"), and (2) whether the newspaper advertisement and statements contained in the newspaper article can constitutionally provide the basis for a libel action,[9] *see Clyburn v. News World Communications, Inc.*, 903 F.2d 29, 33–35 (D.C.Cir.1990) (actual malice privilege in libel cases presents mixed issue of fact and law); Syl. Pt. 6, *Long v. Egnor, supra* ("[a] court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning").

Although we decide this case within our original jurisdiction, we think it appropriate to bear in mind the United States Supreme Court's admonition in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984):

> "The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' "

We believe that our prior prohibition cases concerning free expression issues reflect that we have faithfully adhered to that instruction and to its underlying policy concerns in exercising our original jurisdiction as well as in the appellate review context. *E.g., State ex rel. Hudok v. Henry,* 182 W.Va. 500, 389 S.E.2d 188 (1989); *Long v. Egnor, supra.* And we do so here.

### B.

*Type of Plaintiff: Private Individual or Public Figure*

■ It is now well established that a libel plaintiff's status sets the standard for assessing the defendant's conduct. Plaintiffs who are public officials or public figures must prove by clear and convincing evidence that the defendants made their defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). *See also, e.g., Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30, 80 L.Ed.2d at 524 n. 30 (actual malice exists where defamation defendant "realized

---

**8.** *See* Section II.B., *infra.*

**9.** *See* Section II.C., *infra.*

that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement"); *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968) (defining "reckless disregard" as "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication"); *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964) (plaintiff can show "reckless disregard" by showing defendant(s) had "high degree of awareness of . . . probable falsity"); *Ryan v. Brooks,* 634 F.2d 726, 734 (4th Cir.1980) ("[a]s long as the sources of the libelous information appeared reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of malice insufficient to support a jury verdict, even if a more thorough investigation might have prevented the admitted error" (Citations omitted).); *Estep v. Brewer,* 192 W.Va. 511, 514 n. 3, 453 S.E.2d 345, 348 n. 3 (1994) *(per curiam )* (in order to recover in libel, public figure "must show that the libelous or slanderous statements or writings were made with actual malice toward him or with such recklessness as to show a total disregard of the truth" (Citation omitted).). Private figures need only show that the defendants were negligent in publishing the false and defamatory statement. *E.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345–48, 350, 94 S.Ct. 2997, 3010–11, 3012, 41 L.Ed.2d 789, 809–10, 811 (1974).

In this case, the relators argue that Dr. Romano was a limited purpose public figure with regard to discussion about the Omnibus Health Care Act of 1989 and related health care changes. In *Gertz v. Robert Welch, Inc., supra,* the United States Supreme Court distinguished public figures from private individuals in the following manner: (1)

public figures and officials have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy," 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 808, and (2) public figures and officials have assumed the risk that, in commenting upon public matters, the press may inadvertently report erroneous statements about them, 418 U.S. at 344–45, 94 S.Ct. at 3009–10, 41 L.Ed.2d at 808. Some individuals, because of their prominence or notoriety, are public figures for all purposes. Others have merely "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808, and they thereby become "limited purpose public figures". The relators rely on the latter category and contend that Dr. Romano's efforts to influence the debate over public health insurance programs qualified him as a limited purpose public figure.

The doctor insists that he was not a public figure, for a limited purpose or otherwise. In particular, he disputes the relators' contention that he had access to channels of effective communication. Although he wrote several letters to professional organizations, newspapers, and professional publications, he points out that he did not have any control over the decision to publish his writings. Several of them, apparently, were not published.[10] Dr. Romano claims that he did not voluntarily assume or achieve a role of special prominence in the controversy. This lack of prominence, he says, is evidenced by the December 19, 1989, newspaper article, in which Suriano's allegedly defamatory comments appear. Although various Wheeling-area physicians were quoted in the article, Dr. Romano was neither interviewed nor

**10.** It appears, however, that the *Wheeling News Register* published Dr. Romano's May 2, 1989, letter concerning government regulation and financing of health care. *See* Appendix to the Petition, Exhibit 14. In addition, the relators represent that Dr. Romano's letter to the editor of the *Wheeling Intelligencer* responding to the relators' advertisement was published, *see* Pet. App., Ex. 7, as were several of his letters to the editors of the *Wheeling Intelligencer* and the *Wheeling News Register* responding to letters

written by a local college professor, Bruce Hartung, regarding publicly-funded health care, *see, e.g.,* Pet.App., Ex. 30, 33, 37. Furthermore, the relators allege that the West Virginia Medical Journal printed at least one of Dr. Romano's letters to that publication's editor. *See, e.g.,* Pet. App., Ex. 25, 45. Finally, the relators state that Dr. Romano indicated in his deposition testimony that several elected officials had responded to his correspondence.

quoted. Consequently, he asserts that his failure to be mentioned in the article, other than with regard to the relators' advertisement, suggests that he had not achieved special prominence in the public debate. Therefore, Dr. Romano maintains he was not a public figure concerning the Omnibus Health Care Act controversy.

Before resolving the dispute about Dr. Romano's status, we think some elaboration of our understanding of the limited purpose public figure doctrine is in order. As the United States Court of Appeals for the Fourth Circuit stated, "a person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants." *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 n. 10 (4th Cir.1994). (Citations omitted). In this regard, the federal courts have "developed a two-part inquiry for determining whether a defamation plaintiff is a limited-purpose public figure. First, was there a particular *'public* controversy' that gave rise to the alleged defamation? Second, was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify 'public figure' status?" *Foretich*, 37 F.3d at 1553. (Emphasis in original). From there, the federal circuits have devised various formulae for analyzing the facts. *Foretich*, 37 F.3d at 1554 n. 11. *Compare, e.g., Foretich*, 37 F.3d at 1553, and *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708–711 (4th Cir.) (*en banc*), *cert. denied*, 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991) (requiring plaintiffs to establish five separate elements), *with Silvester v. American Broadcasting Co., Inc.*, 839 F.2d 1491, 1494 (11th Cir.1988), and *Wald-*

*baum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980) (setting forth a three-part analysis). *See generally* Rodney A. Smolla, *Law of Defamation* §§ 2.09–2.20 (1996) (describing the variations among the circuits).

In our view, the emphasis must be on the twin rationales identified in *Gertz:* public figures have voluntarily waived their private status (at least to the extent they engage in a particular debate) and have ready outlets to respond to attacks, but private figures have not and do not. The "more important" of the rationales is the "compelling normative consideration," *Gertz*, 418 U.S. at 344–45 & 344 n. 9, 94 S.Ct. at 3009 & 3009 n. 9, 41 L.Ed.2d at 808 & 808 n. 9, that public figures "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood." *Foretich*, 37 F.3d at 1552, *citing Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2705–06, 61 L.Ed.2d 450, 458 (1979); Joel D. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va. L.Rev. 1349, 1420 (1975) ("[b]y voluntarily abandoning anonymity in favor of the public spotlight and its attendant heat, public figures have knowingly exposed themselves to a predictable risk of being burned").

■ Accordingly, we hold that a libel plaintiff is a limited purpose public figure if the defendant proves the following:

(1) the plaintiff voluntarily engaged in significant efforts to influence a public debate [11]—or voluntarily assumed a position that would propel him to the forefront of a public debate—on a matter of public [12] concern;

---

**11.** The words "debate" and "controversy" should be read liberally here; in using them, we do not mean to confine the contexts in which an individual can become a limited purpose public figure to those in which the public is divided about the topic of discussion. For example, an individual could become a public figure by crusading against crack cocaine usage or in support of clean government. Those are not (we hope) controversial stands, but they are nevertheless subjects of public interest and concern. *See generally* Robert D. Sack & Sandra S. Baron, *Libel,*

*Slander, and Related Problems* 315 (2nd ed.1994) and authorities cited therein.

**12.** As we develop below, "public" debate or controversy does not encompass all matters that might happen to interest the public. A plaintiff's involvement in a private dispute would not necessarily convert him or her into a public figure, even if that dispute provoked considerable public curiosity and coverage. *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (litigant in spectacular and widely-report-

(2) the public debate or controversy and the plaintiff's involvement in it existed prior to the publication of the allegedly libelous statement; and

(3) the plaintiff had reasonable access to channels of communication that would permit him to make an effective response to the defamatory statement in question.[13]

 Applying the above analysis to Dr. Romano, we conclude that he was a public figure for the limited purpose of discussion about the changes to public health care insurance programs and doctors' responses to them. Clearly, the controversy and Romano's entry into it predated the OCEA's and Suriano's statements. *Foretich,* 37 F.3d at 1553, 1554–55. In order

"[t]o determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons were discussing some specific question. A general concern or interest will not suffice.... [The court] should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d at 1297. (Footnotes and citation omitted).

Based upon this definition, the subjects of state-funded health care and the legislative enactment of the Omnibus Health Care Act of 1989 were matters of substantial public controversy in existence prior to the publication of the allegedly defamatory statements at issue here. In the first section of the Act, the Legislature recognized the uncertain financial stability of the various state-funded insurance programs and proposed methods by which cost savings measures could alleviate this problematic situation. *See* W. Va. Code, 16–29D–1(a) (1989). Passage of the Act generated public protests by both the medical community and public employees' groups. Consequently, a public controversy existed, "the outcome of which affect[ed] the general public or some segment of it in an appreciable way." *Waldbaum,* 627 F.2d at 1296. Nor can there be any question that the "controversy" was "public," as that term was used in *Gertz* and its progeny. *See Time, Inc. v. Firestone,* 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154, 163 (1976); *Foretich,* 37 F.3d at 1554–55. The changes made to the PEIA and their impact on physicians and their patients were matters of considerable and legitimate public interest and debate.

It is clear, too, that Dr. Romano voluntarily thrust himself into the debate and sought to influence its outcome. Indeed, he was aggressively involved. The quantity of his letter writing to newspapers, professional journals and organizations, fellow physicians, and government officials regarding the controversy was impressive and demonstrated an active engagement in the PEIA controver-

---

ed divorce proceeding was not involved in "public controversy").

**13.** This analysis is substantially similar to that adopted by the Fourth Circuit in *Foretich* and *Reuber,* except we do not think that the defendant must necessarily show the plaintiff assumed "a role of special prominence in the public controversy." *Foretich,* 37 F.3d at 1553; *see also Reuber,* 925 F.2d at 709. As we see it, prominence is certainly relevant to the determination of whether the plaintiff had access to communication channels—the greater one's prominence, the greater one's access—but we do not believe it is essential to securing an opportunity to make an effective response. (Generally speaking, the connection between prominence and access is diminished in a case like this one, where the alleged defamation remained localized.) In addition, prominence is relevant to the voluntariness prong, but we believe *Gertz* meant it to be

an alternative basis for establishing public figure status. That is, an individual may assume a position of prominence that would make him a public figure for all purposes, *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808, or that would inevitably give him a seat of importance in the discussion about a particular matter of public controversy or interest. *Little v. Breland,* 93 F.3d 755, 758 (11th Cir.1996) (plaintiff voluntarily assumed position of leadership at municipal convention and visits company at a time when company had been object of substantial public scrutiny); *Silvester,* 839 F.2d at 1496 (to be limited purpose public figure, plaintiff must have either tried to influence outcome of public controversy *or* "could realistically have been expected, because of his position in the controversy, to have an impact on its resolution" (Citation omitted).).

sy.[14] Indeed, the record contains at least fifty examples of such correspondence. In these letters, Dr. Romano set forth his views regarding state-funded health care, his perception of the oppressive restrictions imposed by the West Virginia Omnibus Health Care Act and federal Medicare regulations, explained his reasons for withdrawing from these programs, and frequently exhorted others to join his protest.[15] For example, in his May 2, 1989, letter to the editor of the *Wheeling News Register*, Dr. Romano wrote:

"It is time for people to wake up and fully realize the consequences of the recent West Virginia legislature's [sic] actions. I fear this is only the beginning of greater and greater government control over our lives and that as is the usual state of affairs in government controlled health care systems, the only people that actually suffer are the doctors and the patients while the bureacrats [sic] go on their merry way not having to answer for what they have done." Appendix to the Petition, Exhibit 14.

Just as important, however, is the fact that Dr. Romano worked at the front to rally others, most notably physicians, to join and contribute to the assault on the legislative changes. For example, in a July 10, 1990, letter to the West Virginia Medical Journal, Dr. Romano wrote:

"We physicians in West Virginia need to stand up and be counted. We need to tell the State of West Virginia that what they [sic] are [sic] doing is unfair and, quite frankly, smacks of tyranny and oppression. I cannot force the State of West Virginia to pay for the medical care of my patients, but what I can do is force the State of West Virginia to acknowledge that this is still the United States of America [sic] and we physicians should be treated with respect and should not be relegated to a second or third class citizen status simply

because we practice medicine. We all can make a difference; however; [sic] we have to do it by working through our individual patients. Working through the legislators have [sic] proven to be less than ideal to say the least. I think we need more grass root [sic] support. We need to be more political in our offices and to stand up for our rights. This is a perfect time to be political as many as [sic] our colleagues are leaving the state [sic]. We should point out this to our patients. We should be very vocal in our community and civic groups and, if necessary, write letters to our local papers showing exactly what the Omnibus Health Care Act of 1989 has meant to the State thusfar [sic]." Pet.App., Ex. 45. (Published at 86 W. Va. Med. J. 407–08 (Sept. 1990)).

We also think it is pertinent that the very act that prompted Dr. Romano's inclusion in the OCEA's advertisement was done, at least in part, as an act of protest. When he informed Erisco (the agency that then administered the public employees insurance plan for PEIA) that he would no longer see PEIA patients, he expressly connected his decision "to the recent State Legislature's actions." Pet.App., Ex. 2. More to the point, in another letter to the Medical Journal, dated November 8, 1989, Dr. Romano stated,

"I personally do not participate with the new State program because I feel that it unfairly discriminates against doctors in West Virginia. It also tries to solve a very complicated problem in a simplistic and totalitarian manner. In addition legislation like the Omnibus Health Care Act of 1989 will inevitably result in fewer talented young doctors coming into West Virginia to set up practice and also fewer doctors trained in West Virginia from staying in their home state." Pet.App., Ex. 22. (Published at 86 W. Va. Med. J. 19 (Jan. 1990)).

---

14. The relators suggest that an individual's participation in a letter-writing campaign in an attempt to influence public opinion on an issue may justify characterizing that person as a public figure with regard to that issue. *See, e.g., Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1078–79 (3rd Cir.1988); *Velle Transcendental Research Ass'n, Inc. v. Sanders*, 518 F.Supp. 512,

516–17 (C.D.Cal.1981); *Cassidy v. Merin*, 244 N.J.Super. 466, 476, 582 A.2d 1039, 1044 (App. Div.1990).

15. The exhibits show that the correspondence began in May, 1989, and continued through July, 1990.

When, in a May 16, 1989, letter, Dr. Romano withdrew as a member of the West Virginia Preferred Medical Care Network, he explained his reason:

"The recent state [*sic*] of West Virginia Legislative action, especially with its 'accept one, accept all' provision, wherein doctors in West Virginia who see patients under the West Virginia Workers' Compensation Fund, PEIB [*sic*], Erisco or Medicaid, must see patients from all of these categories, is totally unacceptable to me [*sic*] and the manner in which this 'compromise' came into being and was reached, in my opinion, shows no respect to the medical profession in general, and me in particular.

"I have to opt out of this system as I think it is bad for patient care, puts undo restrictions on my ability to practice medicine and to provide quality care to my patients. I don't need the state [*sic*] of West Virginia or any government or state agency to dictate policy in my *private* medical practice." Pet.App., Ex. 15. (Emphasis in original).

Similarly, in a letter to the West Virginia State Medical Association on September 14, 1989, Dr. Romano wrote:

"I will never voluntarily agree to the provisions of the 1989 Omnibus Health Care Act [*sic*] and I have opted out of the system. I no longer participate in West Virginia state insurance plans. I feel that this is my right as an independent practitioner who has never been subsidized by the State of West Virginia and therefore should not be subject to some of the ridiculous provisions of this law.... The legislators should be ashamed of themselves for passing such a poor piece of legislation as the Omnibus Health Care Act. I hope they come to their senses and repeal it." Pet. App., Ex. 17.

Romano also asked the Association to show his letter and a copy of his curriculum vitae to the state's legislators. *Id.* On October 5, 1989, Dr. Romano wrote to David Lambert, General Counsel of the PEIA:

"I have sent two letters to Sally Richardson, the Director of the PEIA [*sic*] stating that I will not participate with the PEIA in the future. I outlined in both my letters that I felt that the Omnibus Health Care Act was a bad law and that since I disagree with its provisions and since I have the option to opt out of the system, I choose the latter action." Pet.App., Ex. 5.

Dr. Romano took, in his mind, a principled stand. But when a citizen commits a controversial act to protest a governmental decision, he should not be surprised when that act becomes a matter of public attention and criticism. Similarly, we can applaud Dr. Romano for his participation in the public discussion on an issue of major importance and for his bold, blunt, and tireless efforts to get his point across. Such efforts, however, do not come without public notoriety that can translate into public figure status for purposes of that discussion. Based on the combination of the quantity and vigor of his efforts to influence the debate, on his attempts to lead others into the debate, and on the close connection between his act of protest in opting out of the PEIA and the allegedly libelous statements, we conclude that Dr. Romano's participation in this public controversy was significant enough to render him a public figure for purposes of that debate.

The only remaining inquiry in the public figure analysis is to determine whether Dr. Romano had reasonable access to communication channels that would permit him to make an effective response to the statements in question. In analyzing this factor, we deem it important to consider the particular forum in which the allegedly libelous charge occurred. That is, the channels for "effectively" responding to an advertisement and story in the *Wheeling News Register* would be quite different from those needed to rebut a charge on "20/20." *Compare Time, Inc. v. Firestone*, 424 U.S. at 453, 96 S.Ct. at 965, 47 L.Ed.2d at 162–63 (plaintiff (party to divorce case) may have been public figure in her local community, but not for purpose of responding to article in *Time* magazine) *with Silvester*, 839 F.2d at 1494 ("plaintiffs [owners of jai alai arenas] were public figures for the limited purpose of issues concerning the Jai Alai industry" in case regarding "20/20" tele-

vised news program's investigation of alleged corruption in jai alai).

We think the relators have established that Dr. Romano had ample means to respond. He certainly demonstrated his ability to write letters, including letters to the media, and to get at least some of them published.[16] Most significantly, Dr. Romano either did respond, or could have responded, in the very same forum—local newspapers—that was used to make the allegedly libelous charge against him. He wrote a letter to the *Wheeling Intelligencer* complaining about the OCEA ad and giving his response, and the letter was published. And the record indicates no reason why Dr. Romano could not have responded to the OCEA ad by purchasing his own ad.[17] We conclude that Dr. Romano had access to effective outlets to set the record straight for the audience, local newspaper readers, that was exposed to the advertisement and article about which he complained.

Accordingly, we hold that Dr. Romano was a public figure for purposes of discussion about State-funded medical insurance programs and the legislative changes made to them in 1989.

### C.

### *Elements of Defamation Action*

■ Because Dr. Romano was a limited purpose public figure, the appropriate test for defamation is set forth in Syllabus Point 4 of *Long v. Egnor*, 176 W.Va. 628, 346 S.E.2d 778 (1986):

> " '[A] public official ... can sustain an action for libel only if he can prove that: (1) the alleged libelous statements were false or misleading; (2) the statements tended to defame the plaintiff and reflect shame, contumely, and disgrace upon him; (3) the statements were published with knowledge at the time of publication that they were false or misleading or were published with a reckless and willful disregard

of truth; and, (4) the publisher intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material.' Syllabus Point 1, in part, *Sprouse v. Clay Communication, Inc.*, 158 W.Va. 427, 211 S.E.2d 674, 95 A.L.R.3d 622, *cert. denied*, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975)."

As we explain below, Dr. Romano's claim cannot meet the first and third requirements.

### 1. *The Advertisement*

■ Dr. Romano conceded that he withdrew from the state insurance programs, but nevertheless insists that the advertisement was false because he continued to treat state insured patients on a private basis; he was willing to treat PEIA members who would agree to forego their insurance and pay him directly. We conclude, however, that the OCEA's accusation was substantially true and was, therefore, protected speech. As the Supreme Court stated in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 2432–33, 115 L.Ed.2d 447, 472 (1991):

> "The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication.... It overlooks minor inaccuracies and concentrates upon substantial truth.... Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' *Heuer v. Kee*, 15 Cal.App.2d 710, 714, 59 P.2d 1063, 1064 (1936)[.]" (Citations omitted).

*Accord Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287 (D.C.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298 (2nd Cir.1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987); *Bryan v. Massachusetts Mut. Life Ins. Co.*, 178 W.Va. 773, 780, 364 S.E.2d 786, 793 (1987) ("before a statement

---

**16.** *See* note 10, *supra.*

**17.** Although it is relevant that the *Wheeling News Register* did not contact Dr. Romano for his response to the OCEA when it ran the follow-up story, we do not think that fact can be controlling. The issue is not whether Dr. Romano had an opportunity to respond in the same article; the issue is whether he had an effective opportunity to rebut the charges in the same market. As the text shows, he plainly did.

can be considered defamatory, it must be false"); *see generally* Sack & Baron, *supra* note 11, at 183–87. A "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' R. Sack, *Libel, Slander, and Related Problems* 138 (1980)[.]" *Masson,* 501 U.S. at 517, 111 S.Ct. at 2433, 115 L.Ed.2d at 472.

In this case, the question is whether the reader would have formed a different opinion of the plaintiff if, instead of reading, "Your children's teachers and their families have been denied health services by [Dr. Romano]," the advertisement had stated, "Your children's teachers and their families have been denied health services by [Dr. Romano] unless they were willing and able to forego their state medical insurance and pay him out of their own pockets." If the two statements create a different impression of Dr. Romano, the difference escapes us. Read in context, both statements accuse him of refusing to treat teachers because of the source of their health insurance. The omitted fact—that he treats teachers who pay him personally—does not diminish the allegation because it does not alter the fact that he was still doing what he was accused of doing. To draw an analogy, if the ad read, "Teacher Smith uses corporal punishment on your children," Mr. Smith could not establish falsity by proving that there were some students in his class that escaped his rod. Similarly, Dr. Romano cannot prove the error of the advertisement in this case with evidence that he served self-paying teachers.

Additionally, we cannot ignore the common sense conclusion that, if patients are told that their doctor will no longer accept their insurance and that they must pay him out of their own pockets, the overwhelming majority of such patients will look for another doctor or go without the sought-for service. Certainly, for many, if not most, state and educational employees, a doctor's refusal to accept the insurance payment is tantamount to a refusal to provide medical services. Indeed, when Dr. Romano wrote to Erisco to give notice that he was opting out of the PEIA plan, he stated:

"It is my unpleasant task to inform you that *I can no longer see West Virginia State Employee insurance patients.* Due to the recent State Legislature's actions, I find that working under the system they [sic] have [*sic*] established is intolerable and, therefore, *I will be discharging my patients that I have under Erisco.*

"To be fair I will give them prescriptions and medications up to one month's supply. *This should give them ample time to find another doctor of their choice.*" Pet.App., Ex. 2. (Emphasis added).

It is difficult to fault the relators for their failure to specify that Dr. Romano still served patients who personally pay for his services when the doctor did not always make the distinction himself. Moreover, we note that the advertisement did not necessarily preclude the possibility that some teachers were continuing to receive health services from the listed doctors. It merely said teachers "have been denied services" by the physicians. It thus left open the possibility that some teachers were being, or would be, provided with treatment by those doctors. And Dr. Romano does not deny that he refused to treat at least some teachers.

Furthermore, even if the ad's omission rose to the level of a substantial falsehood, the record provides no support, let alone clear and convincing proof, for a finding of actual malice. The ad was based entirely on information provided by PEIA, which stated that certain doctors had withdrawn from the PEIA plan. The OCEA fairly deduced from the release (reached the common sense conclusion we noted above) that the listed doctors were not treating OCEA members and their families. The governmental release did not indicate that deduction was false, and there is nothing in the record to suggest that the OCEA had any other information that would have put it on notice that its charge might not be completely accurate or that the non-PEIA-participating physicians were, in fact, treating PEIA insureds.

Certainly, no evidence sustains the conclusion that the OCEA either knew of any inaccuracy or made the statement with a

"high degree of awareness of [its] probable falsity." *Garrison v. Louisiana*, 379 U.S. at 74, 85 S.Ct. at 216, 13 L.Ed.2d at 133. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. We can concede to the doctor his contention that the OCEA intended to embarrass him and damage his reputation. But that does not mean the charge was made with actual malice.[18] An intent to inflict harm is not actual malice; rather, a plaintiff must prove, by clear and convincing proof, an "intent to inflict harm through falsehood." *Henry v. Collins*, 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892, 893 (1965) *(per curiam )*. *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 108 S.Ct. 876, 880, 99 L.Ed.2d 41, 50 (1988) ("[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred" (Citation omitted).).

Thus, we hold, in the alternative, that the advertisement was protected because it was substantially true and that, if and to the extent it created a false impression, the statement was within the actual malice privilege.

### 2. *The News Story*

■ The alleged libel in the follow-up news story was Suriano's statement, "Certain public employees need to know who is not treating them now[.] We felt that the teachers needed to know that. Maybe this will shake those doctors up[.] They should honor their professional code. We would not turn away one of their children." The first sentence basically repeats the advertisement and was, for reasons we stated above, substantially true and privileged. The second sentence simply recites Suriano's belief as to the OCEA's obligations to its members and makes no reference, explicit or implied, to anyone else. The third sentence states the purpose of the advertisement—"to shake those doctors up." The last sentence refers to the OCEA members' sense of their duty. To the extent it might have implied the doctors were "turning away" patients, it, too, was substantially true and privileged. None of those statements can, standing alone, support a defamation claim.

■ If Romano has a claim, then, it must rest on the fourth sentence. Read literally, "They [*i.e.*, 'those doctors'] should honor their professional code," accuses no one of anything; it merely states a noncontroversial, nondefamatory belief about what the doctors *should* do, not what they did. On the other hand, the sentence can also be read to imply that "those doctors"—those who had opted out of the PEIA—were not, in doing so, honoring their professional code. Whether that is actionable, we think, turns on the word "code". If the statement is read as saying merely that Dr. Romano and the other doctors violated a general professional duty by refusing to serve certain patients who come to them simply because of the source of their insurance, the statement is not provably false. If the statement cannot be proved to be a falsehood, then Dr. Romano could not establish a crucial element (falsity) of his libel claim. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 18 (1990) ("a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection" (Footnote omitted).); Syl. Pt. 4, *Maynard v. Daily Gazette Co.*, 191 W.Va. 601, 447 S.E.2d 293 (1994) ("[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection"); *Hinerman v. Daily Gazette Co., Inc.*, 188 W.Va. 157, 174, 423 S.E.2d 560, 577 (1992), *cert. denied,* 507 U.S. 960, 113 S.Ct. 1384, 122 L.Ed.2d 759 (1993) ("[u]nless an opinion, no matter how scurrilous, implies undisclosed defamatory facts, we protect it. Sharp, vituperative and

---

18. An intent to injure, however, would be relevant. Such intent could make it more likely that the speaker intentionally lied or recklessly disregarded the truth, if falsehood is established. The intent could also be relevant to damages issues.

biting criticism are at the heart of free debate" (Citation omitted).). *See also Redco Corp. v. CBS, Inc.,* 758 F.2d 970 (3rd Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985) (holding general charge of unethical practices to be privileged expression of opinion); *Lauderback v. American Broadcasting Co., Inc.;* 741 F.2d 193 (8th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985) (same); *Lewis v. Time, Inc.,* 710 F.2d 549, 554 (9th Cir.1983) (inference of doubtful morality or professional skill is "broad, unfocused, wholly subjective comment, not the kind of factual expression for which the Constitution permits liability to be imposed"); *Rothman v. Sternberg,* 207 A.D.2d 438, 615 N.Y.S.2d 748 (1994) (statements of opinion generally are not actionable because they can neither be verified nor proven false by the plaintiff).

Obviously, Dr. Romano felt that the State had unfairly dumped the PEIA fiscal problems on doctors and that that injustice warranted, even compelled, what in his mind was a principled refusal to treat patients relying on PEIA insurance. That is not an unreasonable perception. Nor is it unreasonable, however, for the OCEA and Mr. Suriano to believe that it is unethical for doctors to put their personal or political interests above the health interests of their patients and that refusing to treat patients for personal or political self-interest is of the same order as refusing to treat patients because they are black, Jewish, or Norwegian. The point is that no jury can say which of these views is the "true" one; truth here lies in the indeterminate sphere of ethical beliefs. As with aesthetics, we can argue over them all we want, but there is no way to choose, as a matter of legal factfinding, the right or wrong belief. *Milkovich, supra; Lewis v. Time, Inc., supra.*

A third reading of the key sentence, however, offers Dr. Romano hope. By that reading, the statement implies that Dr. Romano and the others did not simply violate some general ethical standard—about which there can be no finality—but that they violated some specific provision of the code regulating physicians. That reading does render a statement that is provably true or provably false. Indeed, we have a Board of Medicine whose charge is to hold hearings and make determinations about whether a doctor has violated some provision or other of the Medical Practice Act. W. Va.Code, 30–3–1 *et seq.*

This case, then, really comes down to the issue of whether that third reading is sufficiently reasonable as to create an issue for the jury. After careful consideration, and keeping in mind the responsibility that judges have in making mixed fact-law determinations in cases that embrace the freedoms of expression, *Bose, supra,* we conclude that the statement does not justify putting the parties through the expense of a trial. The statement must be read in context. It comes from a lay person who is speaking spontaneously and in general terms. He does not identify what code he is referring to, makes no reference to any specific provision, and does not contend that the doctors should be disciplined, which is the consequence of violating W. Va.Code, 30–3–14 (1989), of the Medical Practice Act (the "law" regulating physicians' conduct). The clear implication is that Mr. Suriano believed doctors have a moral duty, not a legally compelled one, to serve patients regardless of the source of their insurance. We will not permit imposition of damages on either the OCEA or Mr. Suriano for expressing that opinion while engaged in candid, if acerbic, discussion about an issue of vital public importance. The statement was, simply put, part of the rhetoric of free and open debate. *See, e.g., Hustler Magazine, Inc. v. Falwell,* 485 U.S. at 56, 108 S.Ct. at 882, 99 L.Ed.2d at 52; *Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 11–12, 90 S.Ct. 1537, 1540–41, 26 L.Ed.2d 6, 13–14 (1970); *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401–02, 22 L.Ed.2d 664, 667 (1969) (*per curiam*) ("[t]he language of the political arena, like the language used in labor disputes, *see Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 58[, 86 S.Ct. 657, 661, 15 L.Ed.2d 582, 587] (1966), is often vituperative, abusive, and inexact").

### III.

### CONCLUSION

This is a classic case of a public controversy producing expression of a vibrant, but

astringent, character. All of the players in this litigation participated in that debate and exposed themselves to sharp counterattacks. The market provided the players with ample opportunity to vindicate their respective positions. Although neither the First Amendment of the United States Constitution nor Article III, Section 7 of the West Virginia Constitution requires that participants in public debate must endure intentional or reckless falsehoods aimed at their reputations, those provisions do require that the debaters must steel themselves to harsh criticism that does not exceed the actual malice privilege. Dr. Romano's remedy in this case for any injury he might have suffered because of the relators' speech is limited to using the communication channels provided by the market to rebut whatever charges were leveled against him.

For the reasons stated above, we conclude that a writ of prohibition shall issue prohibiting further proceedings in the underlying civil action for libel.

Writ granted.