389 S.E.2d 188

**STATE of West Virginia ex rel. Ron HUDOK and Natasha Singh**

v.

**Hon. Patrick G. HENRY, III, Judge of the Thirty–First Judicial Circuit; Hon. Thomas W. Steptoe, Jr., Judge of the Twenty–Third Judicial Circuit; David Born and Linda Butner.**

No. 19207.

Supreme Court of Appeals of West Virginia.

Dec. 20, 1989.

Rehearing Denied Feb. 8, 1990.

ry, III, Judge of the Thirty–First Judicial Circuit, acted beyond his legitimate authority in finding them in contempt for failing to answer questions at an administrative hearing to contest the discharge of Linda Butner from her job as clerk of the Magistrate Court of Jefferson County.

Peter L. Chakmakian, Charles Town, for Natasha Singh.

Herbert G. Underwood, Matthew J. Mullaney, Steptoe & Johnson, Clarksburg, for Ron Hudok.

Patrick G. Henry, III, Judge, Circuit Court, Martinsburg, pro se.

David Born, Family Law Magistrate, Fairmont, pro se.

Thomas Steptoe, Jr., Judge, Circuit Court, Charles Town, pro se.

Prosecutor Michael Thompson, Charleston, Jane E. Kirtley, The Reporters Committee for Freedom of the Press, Washington, D.C., for respondents.

Steven Askin, Martinsburg, for Linda Butner.

MILLER, Justice:

In this original proceeding in prohibition, we are asked to determine the extent of a news reporter's privilege to decline to answer questions or to divulge information obtained in the course of his news-gathering function. The privilege is asserted under the free press clause of the First Amendment to the United States Constitution,[1] as well as under Article III, Section 7 of the West Virginia Constitution.[2] The reporters, Ron Hudok and Natasha Singh, contend that the Honorable Patrick G. Hen-

## I.

This controversy arose after Mrs. Butner spoke to Ron Hudok, a reporter with *The Martinsburg Evening Journal*, with regard to a search of her home by sheriff's deputies pursuant to a warrant. In this interview, published in the paper on April 11, 1989, under Mr. Hudok's by-line, Mrs. Butner claimed that the sheriff had used the search "to get his name out of the limelight." She also indicated that the affidavit for the warrant was "sloppy" in that it contained a number of typographical errors.

On May 15, 1989, Mrs. Butner was placed on a thirty-day administrative leave by one of the respondent judges, the Honorable Thomas W. Steptoe, Jr., Judge of the Twenty–Third Judicial Circuit. Subsequently, on May 26, 1989, the paper published another interview with Mrs. Butner under the by-line of Beth Traubert. In this article, it was reported that Mrs. Butner had appeared before the Jefferson County Commission complaining that the sheriff was attempting to set her up as a drug pusher. The article pointed out that Mrs. Butner's husband had previously been arrested for cultivating marijuana, but that she had not been charged with any wrongdoing.

On June 6, 1989, Judge Steptoe entered an order removing Mrs. Butner as magis-

---

**1.** The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**2.** W.Va. Const. art. III, § 7 states:

"No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation."

trate clerk.[3] Mrs. Butner requested an administrative hearing to protest her firing.

An evidentiary hearing was set for September 18, 1989, before a hearing examiner. Both newspaper reporters were subpoenaed by Judge Steptoe to support his case for firing Mrs. Butner. In addition, Judge Steptoe issued a subpoena to Natasha Singh, a reporter for a local radio station. Ms. Singh had conducted an interview with Mrs. Butner which had never been made public. Judge Steptoe had become aware of the interview and called Ms. Singh on the telephone. According to Judge Steptoe, when asked if Mrs. Butner had made comments about the sheriff, Ms. Singh responded that Mrs. Butner had nothing nice to say about him.

At the administrative hearing, Mrs. Butner admitted that the comments attributed to her in the May 26, 1989 newspaper article were essentially correct. Ms. Traubert was released from her subpoena and was not required to testify. Judge Steptoe then questioned Ms. Singh as to whether Mrs. Butner had been critical of the sheriff in her interview. Despite her claim of a First Amendment news-gathering privilege, Ms. Singh was ordered by the hearing examiner to answer Judge Steptoe's question. Ms. Singh refused to respond on First Amendment grounds. Mr. Hudok was also required to take the stand. He responded to several preliminary questions, but when

asked whether Mrs. Butner had made the remark, "I feel we were used by the sheriff to get his name out of the limelight," he declined to answer, claiming a First Amendment privilege.

The administrative hearing was adjourned, and the next day a contempt ruling was sought from Judge Henry, who concluded that Mr. Hudok and Ms. Singh were in civil contempt for refusing to testify. He ordered them to be incarcerated until they purged themselves of contempt by responding to the questions. This order was stayed to allow application to this Court.

## II.

In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the United States Supreme Court first had occasion to decide whether a reporter could claim a privilege under the First Amendment to refuse to disclose confidential sources to a grand jury engaged in a criminal investigation. The Court declined to find such a privilege based on the reporter's claim that disclosure would cause substantial interference with news gathering and breach the confidentiality of news sources vital to a free and independent press. It is generally recognized, however, that *Branzburg* does stand for a qualified privilege.[4]

Following *Branzburg*,[5] most courts have formulated a balancing test patterned after

---

3. W.Va.Code, 50–1–8 (1987), provides, in part: "The magistrate court clerk shall serve at the will and pleasure of such circuit judge."

4. *Branzburg* was decided on a 5–4 vote. Justice White, writing for the majority, made this observation:

"[N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." 408 U.S. at 707–08, 92 S.Ct. at 2670, 33 L.Ed.2d at 655. (Footnote omitted).

Justice Powell, whose concurrence made the fifth vote, spoke of the "limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with regard to the gathering of news or in safeguarding their sources." 408 U.S. at 709, 92 S.Ct. at 2671, 33 L.Ed.2d at 656. He outlined a balancing test and concluded that if a newsperson "is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation," he would be entitled to First Amendment protection. 408 U.S. at 710, 92 S.Ct. at 2671, 33 L.Ed.2d at 656.

5. Prior to *Branzburg*, the cases generally involved reporters who claimed an absolute privilege against testifying before a grand jury. The courts refused to uphold this position. *See* Annot., 102 A.L.R. 771 (1936) (privileged communications to news gatherer).

Justice Stewart's dissent in *Branzburg*[6] and summarized in *In Re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982):

"The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." (Citations omitted).

*See also United States v. Burke*, 700 F.2d 70 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981); *LaRouche v. National Broadcasting Co.*, 780 F.2d 1134 (4th Cir.), *cert. denied*, 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *CBS, Inc. v. Superior Court*, 85 Cal.App.3d 241, 149 Cal.Rptr. 421 (1978); *Morgan v. State*, 337 So.2d 951 (Fla.1976); *Matter of Contempt of Wright*, 108 Idaho 418, 700 P.2d 40 (1985); *State v. Sandstrom*, 224 Kan. 573, 581 P.2d 812 (1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979); *In Re Subpoena Duces Tecum v.*

*Zulka*, 489 N.E.2d 146 (Ind.App.1986); *In Re Contempt of Stone*, 154 Mich.App. 121, 397 N.W.2d 244 (1986); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 523 N:E.2d 277 (1988); *Brown v. Commonwealth*, 214 Va. 755, 204 S.E.2d 429, *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974). *See generally* Annot., 99 A.L.R.3d 37 (1980) (privilege against disclosure of confidential source or materials). *Contra In re Grand Jury Proceedings*, 810 F.2d 580 (6th Cir.1987).

*Branzburg* involved a reporter[7] who had been subpoenaed to testify before a grand jury investigating drug dealing based on two articles written by the reporter from personal observation. The reporter refused to identify the persons who were involved in the drug episodes that he had witnessed and who formed the basis of his articles. *Branzburg's* underpinning was the obvious public importance of effective criminal investigation and the duty of citizens to furnish to a grand jury relevant information regarding criminal activity of which they are knowledgeable.

In this case, we do not deal with a grand jury subpoena, but with a subpoena issued for an administrative hearing.[8] Courts have been more reluctant to enforce subpoenas against reporters in civil or administrative proceedings. As the court stated in *Zerilli v. Smith*, 211 U.S.App.D.C. 116, 123, 656 F.2d 705, 712 (1981): "Every other

---

**6.** Justice Stewart wrote:

"Thus, when an investigation impinges on First Amendment rights, the government must not only show that the inquiry is of 'compelling and overriding importance' but it must also 'convincingly' demonstrate that the investigation is 'substantially related' to the information sought.

"Governmental officials must, therefore, demonstrate that the information sought is *clearly* relevant to a *precisely* defined subject of governmental inquiry. *Watkins [v. United States*, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957) ]; *Sweezy [v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) ]. They must demonstrate that it is reasonable to think the witness in question has that information. *Sweezy, supra; Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963) ]. And they must show that there is not any means of obtaining the information less de-

structive of First Amendment liberties." 408 U.S. at 740, 92 S.Ct. at 2679–80, 33 L.Ed.2d at 674–75. (Emphasis in original; footnotes and citations omitted).

Justice Douglas, in a separate dissent, maintained that there was an absolute privilege. 408 U.S. at 711, 92 S.Ct. at 2686, 33 L.Ed.2d at 657.

**7.** The question of what type of activities make a person a journalist and what type of material is covered as news gathering is discussed in *Von Bulow by Auersperg v. Von Bulow*, 811 F.2d 136 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

**8.** No one raises the issue as to the validity of the subpoena. The administrative hearing was an ad hoc procedure. We, therefore, do not address the question of the source of the right to subpoena. *See Appalachian Power Co. v. Public Serv. Comm'n*, 170 W.Va. 757, 761 n. 8, 296 S.E.2d 887, 890 n. 8 (1982).

circuit that has considered the question has also ruled that a privilege should be readily available in civil cases, and that a balancing approach should be applied." [9] *Zerilli* also recognized the distinction between civil actions in which the reporter is a party and those in which he is not. Where the reporter is a party, and particularly in a libel action, "the equities weigh somewhat more heavily in favor of disclosure." 211 U.S.App.D.C. at 125, 656 F.2d at 714.[10]

In this case, there was no confidential informant. Mr. Hudok's article disclosed Mrs. Butner's name. Indeed, it was her comments therein that led, in part, to her termination. Because Ms. Singh disclosed to Judge Steptoe that she had interviewed Mrs. Butner, much the same situation exists. The only difference is that Ms. Singh did not publish the results of her interview.[11]

The parties do not discuss whether the nonconfidentiality of the source should be a determinative factor in deciding whether a qualified privilege exists. As we have earlier pointed out, courts have considered the qualified privilege to rest on two general grounds: (1) the protection of confidential sources which is often critical to news gathering, especially on sensitive subjects where a promise of anonymity is often the only way in which the reporter can obtain information and develop news leads, and (2) the news-gathering function itself would be substantially hampered and the free flow of information to the public would be impinged if newspersons could be routinely subpoenaed. Most courts that have confronted this latter question have held that the mere fact that there is no confidential source will not bar the exercise of the qualified privilege. *E.g., United States v. Cuthbertson, supra; In Re Subpoena Duces Tecum v. Zulka, supra; Bell v. City of Des Moines,* 412 N.W.2d 585 (Iowa 1987); *O'Neill v. Oakgrove Constr., Inc., supra; Austin v. Memphis Publishing Co.,* 655 S.W.2d 146 (Tenn.1983).

We find these principles to be well established and to follow our understanding of the First Amendment free press clause. In *State ex rel. Daily Mail Publishing Co. v. Smith,* 161 W.Va. 684, 690, 248 S.E.2d 269, 272 (1978), *aff'd,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), we "concluded that a robust, unfettered, and creative press is indispensable to government by free discussion and to the intelligent operation of a democratic society." (Footnote omitted).

The view of the First Amendment adopted by the majority of jurisdictions since *Branzburg* seems to be eminently

**9.** For this proposition, the *Zerilli* court cited these cases:

"*Riley v. City of Chester,* 612 F.2d 708, 715–716 (3d Cir.1979) (upholding assertion of privilege); *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 436–438 (10th Cir.1978) (same); *Baker v. F & F Investment,* [470 F.2d 778] at 783 [ (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) ] (same); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972) (same); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 725 (5th Cir.1980) (ruling that privilege does not prevail); *see also Democratic Nat'l Committee v. McCord,* 356 F.Supp. 1394, 1398 (D.D.C.1973) (upholding privilege); *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co.,* 455 F.Supp. 1197, 1203 (N.D.Ill.1978) (same); *Altemose Construction Co. v. Building & Construction Trades Council of Philadelphia,* 443 F.Supp. 489, 491 (E.D.Pa. 1977) (same); *Gilbert v. Allied Chemical Corp.,* 411 F.Supp. 505, 508 (E.D.Va.1976) (same)." 211 U.S.App.D.C. at 123, 656 F.2d at 712. (Footnote omitted).

**10.** *Zerilli,* 211 U.S.App.D.C. at 125, 656 F.2d at 714, made this statement: "As we suggested in

*Carey v. Hume,* [160 U.S.App.D.C. 365], 492 F.2d [631] at 634, 636–639 [*cert. dismissed,* 417 U.S. 938, 41 L.Ed.2d 661, 94 S.Ct. 2654 (1974) ], this will be particularly true in libel cases involving public officials or public figures where the rule of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), applies." The United States Supreme Court in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), considered at some length the related question of the extent to which the plaintiff, a public figure, could, through discovery in a libel action, explore the motives and the editorial process of the press persons who had produced an alleged defamatory article.

**11.** Courts extend the qualified privilege to news material even though it may not have been published, subject to the broader disclosure exception set out in note 10, *supra,* for libel cases. *E.g., In Re Subpoena Duces Tecum v. Zulka, supra; Bell v. City of Des Moines,* 412 N.W.2d 585 (Iowa 1987); *O'Neill v. Oakgrove Constr., Inc., supra.*

fair and workable. To our knowledge no court has adopted an absolute privilege against disclosure by reporters without regard to a vital societal need for the information. As we have already pointed out, these cases from other jurisdictions make it clear that the privilege applies to not only confidential sources, but to information obtained in the regular news-gathering process. Furthermore, it is recognized that this qualified privilege will yield in proceedings before a grand jury where the reporter has personal knowledge or is aware of confidential sources that bear on the criminal investigation, but will be more vigorously applied with regard to civil cases, except those in the libel area.[12]

We recognize that there may be those occasions when a newsperson is the only individual with credible evidence that bears upon an important issue in civil litigation. In this situation, there may be no alternative under principles of due process other than to require such testimony. This narrow rule is justified by the fact that the media is given broad access to accident scenes as well as to the inner offices of government buildings and other places where they may be the only witnesses to a crucial statement or event.

 Finally, where the reporter is not engaged in the news-gathering function, he is subject to giving testimony as to what he observed to the same extent as any other witness. Thus, we conclude that to protect the important public interest of reporters in their news-gathering functions under the First Amendment to the United States Constitution, disclosure of a reporter's confidential sources or news-gathering materials may not be compelled except upon a clear and specific showing that the information is highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

 When we apply these principles to the present case, we find that the trial court erred in holding these reporters in contempt. The trial court rested its holding on the belief that there was no qualified privilege available because there were no confidential sources. As we have earlier pointed out, the general rule is that a qualified First Amendment privilege is available to the news-gathering material whether confidential, published, or not published.

In this case, the relevance of the information sought to the main purpose of the discharge was tenuous at best. As earlier noted, Mrs. Butner was an at-will employee and could have been terminated from her position as clerk of the Magistrate Court of Jefferson County without any reason.[13] The chief ground for her termination was that she had made detrimental public statements about her husband's criminal case, which was pending in the magistrate court.[14] It was on this basis that Mr. Hudok's April 11, 1989 news article was relevant.

It appears that Mrs. Butner admitted making the remarks attributed to her in the May 26, 1989 article. These remarks, commenting on a pending criminal proceeding,[15] were far more serious than the rath-

12. *See* note 10, *supra.*

13. *See* note 3, *supra.*

14. Judge Steptoe's termination letter contained this statement:
 "The reasons for your dismissal are as follows:
 \*　\*　\*　\*　\*　\*
 "2. CONDUCT DETRIMENTAL TO THE JUDICIARY, in that notwithstanding your position as Clerk of the Magistrate Court of Jefferson County, West Virginia, you publicly injected yourself by numerous public statements into the impending (and now pending) case of State of West Virginia v. Carl Butner, which case was initiated in the very Court

which you represent as Clerk, thus tending to create a very damaging public perception that the Magistrate Court of Jefferson County, West Virginia is not impartial."

15. The May 26, 1989 article reported that Mrs. Butner made the following statements to the Jefferson County Commission:
 "Butner publicly accused Sheriff Bob Buracker of misconduct Thursday, saying he tried to 'set her up' as a drug pusher.
 \*　\*　\*　\*　\*　\*
 "'I am making a formal charge.' Butner told Commission President Henry Morrow Sr.

er mild statement made in the April 11, 1989 article to the effect that "I feel we were used by the sheriff to get his name out of the limelight."[16] When asked about the latter statement by Judge Steptoe, Mrs. Butner stated that she was unsure whether she or her husband had made it. Judge Steptoe called Mr. Hudok to impeach Mrs. Butner's testimony. Mr. Hudok's refusal to testify as to the statement led to his contempt citation. In view of Mrs. Butner's acknowledgement of the statements she made in the May 26, 1989 article, we find this impeachment was not critical to the maintenance of Judge Steptoe's claim. The First Amendment qualified privilege should have prevailed.

Much the same may be said of Ms. Singh's refusal to disclose the contents of her interview with Mrs. Butner. The charge made against Mrs. Butner concerned her public comments. The record does not disclose that Ms. Singh published Mrs. Butner's interview. Again, in light of the specific statements made and acknowledged by Mrs. Butner in the May article, Ms. Singh's general statement that Mrs. Butner was critical of the sheriff is neither that highly material nor so relevant to the case as to warrant breaching the qualified privilege.

 We conclude that the respondent judge has exceeded his legitimate powers in holding the reporters in contempt, and thus his ruling is subject to a writ of prohibition under Syllabus Point 4 of *State ex rel. Boards of Educ. v. Chafin*, 180 W.Va. 219, 376 S.E.2d 113 (1988):

> " ' "A writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction exceeds its legitimate powers." Syllabus Point 1, *State ex rel. UMWA International Union v. May-*

*nard*, 176 W.Va. 131, 342 S.E.2d 96 (1985).' Syllabus, *Williams v. Narick*, 177 W.Va. 11, 350 S.E.2d 11 (1986)."

A writ of prohibition is, therefore, issued.

Writ issued.

---

'I want to make it a matter of record that the sheriff has lied.'

\* \* \* \* \* \*

"She claims she has been 'slandered' by Buracker by being publicized along with her husband, especially since she had never been charged with a crime."

16. The other reference to the sheriff in the April 11, 1989 article was indirect: "She said the information attached to the search warrant was 'sloppy,' with 18 typographical errors and an incorrect diagram of the house."