720 So.2d 220 (1998)
STATE of Florida, Petitioner,
v.
Merlan DAVIS, Respondent.
No. 90457.
Supreme Court of Florida.
October 22, 1998.
*221 Robert A. Butterworth, Attorney General, Robert J. Krauss, Senior Assistant Attorney General, Chief of Criminal Law, and Helene S. Parnes, Assistant Attorney General, Tampa, and Patricia R. Gleason, General Counsel, Office of the Attorney General, Tallahassee, for Petitioner.
James Marion Moorman, Public Defender and Allyn Giambalvo, Assistant Public Defender, Tenth Judicial Circuit, Clearwater, for Respondent.
Jonathan D. Kaney, Jr. and Jonathan D. Kaney III of Cobb, Cole & Bell, Daytona Beach, Florida, and Talbot D'Alemberte, Tallahassee, for News-Journal Corporation and First Amendment Foundation, Amici Curiae.
Patricia Fields Anderson of Rehdert, Anderson, McGowan & Steele, P.A., St. Petersburg, Florida, and Talbot D'Alemberte, Tallahassee, for Times Publishing Company and Diane Mason, Amicus Curaie.
Raymond Ehrlich, Sanford L. Bohrer, Gregg D. Thomas, and David S. Bralow of Holland & Knight LLP, Tampa, for Cape Publications, Inc., d/b/a Florida Today; Fernandina Beach News-Leader, Inc.; Florida Society of Newspaper Editors; Gainesville Sun Publishing Company; Jacksonville Television, Inc., d/b/a WJWB-TV Channel 17; Knight-Ridder, Inc., d/b/a The Miami Herald; Lake City Reporter, Inc.; Lakeland Ledger Publishing Corp.; Marco Island Eagle; News-Press Publishing Co.; Ocala Star-Banner Corp.; Pacific and Southern Co., Inc., d/b/a WTSP-TV; The Palatka Daily News, Inc.; Pensacola News-Journal, Inc.; Sarasota Herald-Tribune Co.; Sun-Sentinel Co.; Tampa Television, Inc., d/b/a WFLTV Channel 8; Television 12 of Jacksonville, Inc., d/b/a WTLV-TV; Tribune Co., d/b/a The Tampa Tribune; and WFTV.Inc, d/b/a WFTV and The Palm Beach Post, Amici Curiae.
OVERTON, Justice.
We have for review Davis v. State, 692 So.2d 924 (Fla. 2d DCA 1997), in which the Second District Court of Appeal held that the qualified reporter's privilege has no application in a criminal proceeding unless the privilege is based on the potential implication of a confidential source. In applying that holding to the instant case, the district court found that Merlan Davis, a defendant, was entitled to depose a reporter regarding evidence relevant and material to his case because the reporter had interviewed the victim and had published an article about the interview. The court vacated Davis's conviction and sentence and then certified the following question as being one of great public importance:
IN LIGHT OF THE DECISIONS IN CBS, INC. V. JACKSON, 578 So.2d 698 (Fla.1991), AND MIAMI HERALD [PUBLISHING] CO. V. MOREJON, 561 So.2d 577 (Fla.1990), DOES FLORIDA LAW PROVIDE A QUALIFIED REPORTER'S PRIVILEGE AGAINST THE DISCLOSURE OF NONCONFIDENTIAL INFORMATION RELEVANT TO A CRIMINAL PROCEEDING? *222 Id. at 925. For the reasons expressed, we answer the question in the affirmative, finding that the qualified reporter's privilege in Florida applies to factual situations involving both nonconfidential and confidential information. In reaching this conclusion, we stress that a defendant's constitutional rights to "compulsory process" and "due process" are significant factors that must be considered in determining whether the qualified reporter's privilege will act to preclude the disclosure of the information. Accordingly, under the balancing test set forth later in this opinion, we conclude that the privilege did not apply under the facts of this case but that any error in applying the privilege was harmless.
In answering this question and in clarifying the qualified reporter's privilege in Florida through today's opinion, we emphasize the strong responsibility of the courts to protect the rights of a free press under the principles evolving from the United States Supreme Court's decision in Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). That decision made clear that courts must protect the press from government intimidation and from laws that effectively constitute a prior restraint on the publication of information. Moreover, as the Court stated in Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." However, the Court also noted in Branzburg that "the First Amendment does not invalidate every incidental burdening of the press," nor does a reporter have a special privilege to invade the rights and liberties of others. 408 U.S. at 682-83, 92 S.Ct. 2646.

FACTS
The district court summarized the incident that created the significant issue raised by this case as follows:
The events underlying Davis's conviction began with the January 1990 termination of his romantic relationship with Nicole Terry. In the months following, Davis's behavior towards Terry became increasingly hostile and in May of 1991 she successfully petitioned for an injunction proscribing future contact. The record indicates that Davis largely ignored the injunction. Specifically, on December 27, 1991, while in her car driving over the Skyway Bridge, Terry observed Davis following closely behind her. An erratic and reckless chase ensued. The chase abruptly finished when Davis's car collided with the rear of Terry's. Throughout the proceedings below, Davis has consistently seized upon Terry's admission that she stepped on her car brakes just before the accidentthe implication being that she intended and, in fact, caused Davis to strike the rear of her car.
Davis, 692 So.2d at 925. The accident and related events were the focus of pretrial media attention addressing in part the problems of domestic violence. Diane Mason, a reporter for The St. Petersburg Times, interviewed the victim, Nicole Terry. Mason then authored a story entitled "No Way Out," which included pictures, set forth details of the collision, and quoted comments made directly to her by the victim.
Prior to trial, Davis attempted to depose Mason regarding statements made to her by the victim. By that time, however, Mason was no longer employed by The St. Petersburg Times, and the newspaper refused to provide information to Davis regarding her whereabouts, contending that any conferences Mason had with the victim were protected under the qualified reporter's privilege. This resulted in Davis's filing a motion for subpoena duces tecum. At the hearing on that motion, Davis's counsel stated:
And Diane Mason of the St. Pete Times did quite a lengthy article with large color photographs and so forth of this relationship and of this case.... And Diane Mason in her article, refers to the moment just before the collision actually occurred clearly she spoke to the victim about how the collision occurred. I tried to contact Diane Mason and was advised by the St. Pete Times that she no longer works for them, that they would pass on correspondence. They wouldn't tell me where she was, but they would pass on correspondence. I sent correspondence to *223 her through the St. Pete Times. The response came from counsel for the St. Pete Times in essence saying that anything, any conferences she had with Nicole Terry carry a qualified privilege, that they would not divulge the whereabouts of Diane Mason, that there would be no cooperation in any way in that regard.
In response, counsel for The St. Petersburg Times and Mason argued that, under Tribune Co. v. Green, 440 So.2d 484 (Fla. 2d DCA 1983), the information was protected. In Green, the district court adopted a three-prong test for determining when a reporter is privileged from testifying. Under the test, the moving party must establish that (1) the reporter possesses relevant information; (2) the same information is not available from alternative sources; and (3) the movant has a compelling need for any information the reporter may have. Id. at 485. The district court in Green concluded that the three-prong test is applicable to any proceeding in which information is being sought from a reporter regardless of whether the proceeding is criminal or civil or whether the information sought was obtained from a confidential or nonconfidential source of information. The trial court in this case found that Green controlled. It then concluded that Davis had failed to meet the three-prong test because he had failed to establish that the same information was not available from an alternative source. This finding was based on Davis's concession that the victim had admitted to another witness that she purposely caused the collision.[1]
On appeal, the district court of appeal reversed, finding that its decision in Green was no longer viable in light of this Court's decisions in Miami Herald Publishing Co. v. Morejon, 561 So.2d 577 (Fla.1990), and CBS, Inc. v. Jackson, 578 So.2d 698 (Fla.1991), which, according to the district court, limited the application of a qualified reporter's privilege only to situations implicating a confidential source.

THE QUALIFIED REPORTER'S PRIVILEGE BRANZBURG

The qualified reporter's privilege in Florida finds its origins in the United States Supreme Court plurality opinion in Branzburg. In Branzburg, the Supreme Court addressed the question of whether requiring a reporter to testify before a grand jury regarding information about criminal activity obtained from a confidential source violated the First Amendment guarantees of freedom of speech and freedom of the press. The criminal activity for which the reporters in Branzburg were to be questioned involved their personal observation of the making of hashish, conversations and observations concerning the use and sale of drugs, and interviews and observations concerning subversive activities of the Black Panther Party. In claiming protection under the First Amendment, the reporters argued that, if they were forced to reveal the identity of their sources of information and to disclose other confidences to a grand jury, informants would refuse or be reluctant to furnish newsworthy information in the future, which, in turn, would cause their sources of information to evaporate and would chill the dissemination of information to the public. The Supreme Court, in a plurality opinion authored by Justice White, refused to find that the reporters' information was privileged where "news sources themselves are implicated in crime or possess information relevant to the grand jury's task." 408 U.S. at 691, 92 S.Ct. 2646. In doing so, however, the Court acknowledged that the First Amendment did extend to news gathering activities, noting: "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." 408 U.S. at 681, 92 S.Ct. 2646.
In a concurring opinion, Justice Powell, who provided the fifth and deciding vote in Branzburg, noted the limited holding of the majority's opinion and emphasized the need for a qualified reporter's privilege in some circumstances, stating:
[N]o harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called *224 upon to give information bearing only a remote and tenuous relationship to the subject of the investigation or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim of privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

Id. at 709-10, 92 S.Ct. 2646 (Powell, J., concurring) (emphasis added). In essence, Justice Powell recommended balancing, on a case-by-case basis, a reporter's First Amendment rights against society's interests in obtaining the information.
Three of the dissenting justices in Branzburg argued that a three-prong test should be applied to determine whether a reporter would be required to reveal confidences. Under the test, which is similar to that set forth in Green, the dissenting justices would have required the government to: (1) establish that the information sought was relevant to a specific probable violation of law; (2) demonstrate that the information could not be obtained by an alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information. This test was designed to prevent the government from using reporters as an investigatory arm of the government.

THE PRIVILEGE IN FLORIDA
At the time the Supreme Court decided Branzburg, a number of states had already enacted "shield laws" which, by statute, provided reporters with some degree of protection for their sources and information.[2] By 1996, twenty-nine states had adopted such laws.[3] However, it was not until this year that Florida adopted a shield law for reporters.[4] Consequently, the only protection provided to reporters in Florida prior to 1998 was through case law.
In 1976, this Court, in light of Branzburg, first afforded a qualified reporter's privilege in Florida. In Morgan v. State, 337 So.2d 951 (Fla.1976), we adopted the balancing test set forth in Justice Powell's concurring opinion in Branzburg, finding that a qualified reporter's privilege existed to protect the disclosure of confidential information under the circumstances of that case. In Morgan, Lucy Morgan, a reporter for The St. Petersburg Times, refused to reveal the identity of the source of information for her article published in the Times, which contained the synopsis of a sealed grand jury presentment. The trial court found her to be in contempt and imposed a jail sentence and the district court of appeal affirmed. This Court vacated the contempt citation, finding, under Justice Powell's balancing test, that society's interest in unencumbered access to information from anonymous sources outweighed the general governmental interest in the secrecy of grand jury proceedings sought to be advanced in compelling disclosure of the informant's identity.
We reached a similar conclusion in Tribune Co. v. Huffstetler, 489 So.2d 722 (Fla. 1986). In that case, a Tampa Tribune reporter had authored an article stating that a resident had filed a complaint with the Ethics *225 Commission charging two county commissioners with misuse of office. At that time, complaints of ethics violations were confidential, and revealing the identity of a source of such a complaint was a criminal violation under the statutes. In the investigation that followed publication of the article, the reporter refused to reveal to the state attorney the identity of the reporter's confidential source. Subsequently, the circuit court found him guilty of contempt. This Court again applied Justice Powell's balancing test and found that the reporter's interest in protecting sources of information outweighed the public interest in prosecution for a violation of the particular statute at issue. In doing so, we noted that the societal interests underpinning most criminal statutes were not present in the statute involved in the case because it essentially dealt with a private interest in reputation.
In both Morgan and Huffstetler, we were reviewing the qualified reporter's privilege in the context of confidential information sought by the government. Subsequent to those decisions, we addressed the privilege in two additional cases: Miami Herald Publishing Co. v. Morejon, 561 So.2d 577 (Fla.1990), and CBS, Inc. v. Jackson, 578 So.2d 698 (Fla. 1991). Unlike the factual situations in Morgan and Huffstetler, in Morejon and Jackson, the information sought was requested by a defendant in a criminal proceeding and involved eyewitness observations or visual recordings of a crime.
In Morejon, a reporter on a newsgathering assignment accompanied police officers who were on duty at the airport. While on this routine duty, police officers arrested Morejon and his traveling companion in an airport public concourse after a consensual search of their luggage revealed four kilograms of cocaine. The reporter was an eyewitness to the entire episode, standing approximately five to six feet away and taking notes. Details of the search and arrest, some of which were allegedly inconsistent with the officers' account of the arrest, were later printed in the reporter's article in The Miami Herald.
During pretrial discovery, Morejon sought to depose the reporter. The reporter and The Miami Herald asserted an across-the-board qualified privilege against compelled disclosure of any information obtained by a reporter while on a newsgathering mission. This Court rejected that argument, holding that "there is no privilege, qualified, limited, or otherwise, which protects journalists from testifying as to their eyewitness observations of a relevant event in a subsequent court proceeding. The fact that the reporter in this case witnessed the event while on a newsgathering mission does not alter our decision." 561 So.2d at 580. The Court went on to explain its decision in this way:
The public "has a right to every man's evidence." The privilege not to disclose relevant evidence obviously constitutes an extraordinary exception to this general duty to testify. Evidentiary privileges in litigation are not favored, and even those rooted in the constitution must give way in proper circumstances. As the United States Supreme Court aptly stated in United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974): "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." The fact that journalists may be somewhat inconvenienced by having to appear in court or other related proceedings does not lessen their duty to testify. Ordinary citizens would not be excused from testifying as to what they observed, and the first amendment should not be interpreted to make journalists' testimony privileged simply because they made their observations while on duty as a reporter.
Id. at 581 (citations omitted). Having concluded that no privilege applied under those facts, we found no need to balance the respective interests involved.
In Jackson, the issue also concerned a defendant's request for relevant evidence. A CBS news team videotaped portions of the law enforcement operation that resulted in Jackson's arrest. In preparation for trial, Jackson deposed the arresting officer, whose recounting of the arrest was inconclusive. Jackson then served a subpoena duces tecum on CBS, seeking portions of the videotapes *226 (the out-takes) pertaining to him that were not televised. CBS moved to quash the subpoena, claiming that the out-takes were protected work product under the journalist's qualified privilege. As in Morejon, we concluded that no such privilege applied, stating:
From a first amendment privilege standpoint, we can perceive no significant difference in the examination of an electronic recording of an event and verbal testimony about the event. What Jackson seeks to discover is physical evidence of the events surrounding his arrest. His request does not implicate any sources of information. We see no realistic threat of restraint or impingement on the news-gathering process by subjecting the videotapes to discovery.... Because the qualified privilege does not apply under the circumstances of this case, we need not balance the respective interests involved.
Jackson, 578 So.2d at 700.
In summary, these cases reflect that this Court has adopted a qualified reporter's privilege, at least in those cases involving confidential information; but we have indicated that, where a defendant seeks testimony or evidence, no such privilege exists to excuse reporters from testifying about their eyewitness observations or from providing physical material relevant to a crime. Although a defendant's rights to compulsory and due process under both the federal and Florida constitutions were not explicitly discussed in Morejon or Jackson, those rights are significant factors that are implicated whenever a defendant seeks to discover information relevant to the charges against the defendant. Those constitutional provisions are as follows. The Sixth Amendment to the United States Constitution provides that:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.
(Emphasis added.) Article I, section 9, of the Florida Constitution, entitled "Due process," provides that:
No person shall be deprived of life, liberty or property without due process of law, or be twice put in jeopardy for the same offense, or be compelled in any criminal matter to be a witness against himself.
Section 16, entitled "Rights of accused and of victims," provides in pertinent part:
(a) In all criminal prosecutions the accused shall, upon demand, be informed of the nature and cause of the accusation against him, and shall be furnished a copy of the charges, and shall have the right to have compulsory process for witnesses, to confront at trial adverse witnesses, to be heard in person, by counsel or both, and to have a speedy and public trial by impartial jury in the county where the crime was committed. If the county is not known, the indictment or information may charge venue in two or more counties conjunctively and proof that the crime was committed in that area shall be sufficient; but before pleading the accused may elect in which of those counties he will be tried. Venue for prosecution of crimes committed beyond the boundaries of the state shall be fixed by law.
(Emphasis added.)

OTHER STATES
A review of courts that have considered this issue in states without legislatively-enacted shield laws indicates a variety of holdings. Of the sixteen states that have considered this issue, one has refused to recognize any privilege whatsoever,[5] one has held that no such privilege exists in criminal proceedings,[6] one has found that a less compelling interest may need to be shown in criminal *227 cases,[7] and thirteen have recognized the privilege in some form.[8] One common theme, however, throughout almost all of these cases is that, once a privilege has been found to apply, the courts apply some variety of the three-prong balancing test proposed by the dissent in Branzburg.

CONCLUSION AS TO THE QUALIFIED REPORTER'S PRIVILEGE
Through this opinion, we clarify the limitations of the qualified reporter's privilege in Florida. First, we hold that a qualified reporter's privilege exists in Florida and that such a privilege extends to both confidential and nonconfidential information gathered in the course of a reporter's employment. Second, we hold, consistent with our opinions in Morejon and Jackson, that the privilege does not apply to eyewitness observations or physical evidence, including recordings, of a crime. Third, we hold that, once the privilege attaches, a court must apply the three-prong balancing test used by an overwhelming majority of other states to determine whether the privilege will act to prevent the disclosure of the reporter's information; that is, the court must determine whether the movant has established that: (1) the reporter possesses relevant information; (2) the same information is not available from alternative sources; and (3) the movant has a compelling need for any information the reporter may have. For example, in a criminal case in which the government is seeking information, it would have to establish that the information was relevant to the crime being investigated; that the government could not obtain the information from another source; and that the government has a compelling need to obtain the information to adequately prosecute the crime at issue. As noted by Justice Powell, in determining the compelling need of the government, a court must weigh the freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.
When determining the compelling need of a defendant, however, a court not only must weigh the concerns expressed by Justice Powell; it also must factor into the equation the federal and Florida constitutional rights to compulsory and due process so as to ensure that the defendant receives a fair trial.
In evaluating these concerns, we emphasize that it is the court and not the reporter or the reporter's publisher that determines whether the privilege acts to preclude disclosure. We note that there are instances where reporters do testify without raising the privilege. For instance, in Remeta v. State, 522 So.2d 825 (Fla.1988), a reporter for The Wichita Eagle Beacon newspaper, who interviewed Daniel Remeta at his request, testified at Remeta's trial in Florida regarding what he told her. Similarly, in that same case, a television news reporter from Wichita, Kansas, who also interviewed Remeta at his request, testified by deposition concerning the interview, and the deposition was subsequently introduced in his Florida trial. In neither instance was the privilege at issue. Further, this information was significant in obtaining a conviction against Remeta and in supporting the death penalty, which was eventually imposed in that case.
Notably, our holding in this case is consistent with the recently created "journalist's *228 privilege." That legislation, chapter 98-48, Laws of Florida, provides as follows:
Section 90.5015, Florida Statutes, is created to read:
90.5015 Journalist's privilege. 
(1) For purposes of this section, the term:
(a) "Professional journalist" means a person regularly engaged in collecting, photographing, recording, writing, editing, reporting, or publishing news, for gain or livelihood, who obtained the information sought while working as a salaried employee of, or independent contractor for, a newspaper, news journal, news agency, press association, wire service, radio or television station, network, or news magazine. Book authors and others who are not professional journalists, as defined in this paragraph, are not included in the provisions of this section.
(b) "News" means information of public concern relating to local, statewide, national, or worldwide issues or events.
(2) A professional journalist has a qualified privilege not to be a witness concerning, and not to disclose the information, including the identity of any source, that the professional journalist has obtained while actively gathering news. This privilege applies only to information or eyewitness observations obtained within the normal scope of employment and does not apply to physical evidence, eyewitness observations, or visual or audio recording of crimes. A party seeking to overcome this privilege must make a clear and specific showing that:
(a) The information is relevant and material to unresolved issues that have been raised in the proceeding for which the information is sought;
(b) The information cannot be obtained from alternative sources; and
(c) A compelling interest exists for requiring disclosure of the information.
(3) A court shall order disclosure pursuant to subsection (2) only of that portion of the information for which the showing under subsection (2) has been made and shall support such order with clear and specific findings made after a hearing.
(4) A professional journalist does not waive the privilege by publishing or broadcasting information.
(5) This section must not be construed to limit any privilege or right provided to a professional journalist under law.
(6) Authentication: Photographs, diagrams, video recordings, audio recordings, computer records, or other business records maintained, disclosed, provided, or produced by a professional journalist, or by the employer or principal of a professional journalist, may be authenticated for admission in evidence upon a showing, by affidavit of the professional journalist, or other individual with personal knowledge, that the photograph, diagram, video recording, audio recording, computer record, or other business record is a true and accurate copy of the original, and that the copy truly and accurately reflects the observations and facts contained therein.
(7) If the affidavit of authenticity and accuracy, or other relevant factual circumstance, causes the court to have clear and convincing doubts as to the authenticity or accuracy of the proffered evidence, the court may decline to admit such evidence.
(8) If any provision of this section or its application to any particular person or circumstance is held invalid, that provision or its application is severable and does not affect the validity of other provisions or applications of this section.

THE INSTANT CASE
In this case, Mason has claimed a qualified privilege for the information that the victim divulged to her and which she used in publishing a news story about the event. Because Mason did not witness the event but rather interviewed the victim, Mason is entitled to raise a qualified privilege regarding the information. However, defendant Davis's liberty is at stake and his interests in obtaining the information in light of his rights to a fair trial and to compulsory process should have been factored into the balancing test for determining whether the privilege would preclude disclosure of the *229 information. This is true even in light of the State's contention that the information is privileged because it is available from another source. The fact that the victim allegedly made similar statements to others does not eliminate the need for the defendant to determine what was said to this witness when the testimony is relevant and material to the issues in the case. Nevertheless, we find any error here to be harmless under the circumstances of this case.
The crime for which Davis was charged and convicted was aggravated assault with a motor vehicle. "Assault" is "an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." § 784.011, Fla. Stat. (1997). "Aggravated assault" is a third-degree felony defined in pertinent part as an assault "with a deadly weapon without intent to kill." § 784.021(1)(a), Fla. Stat. (1997). Under the statute, no contact is necessary.
The facts of this case are largely undisputed and reflect that, after Davis and the victim terminated their romantic relationship, Davis repeatedly called and threatened her, and on one occasion left a message on her answering machine stating that he was going to kill her. He also threatened to kill an officer who went to the victim's home and answered her phone. Based on this conduct, the victim obtained an injunction against Davis prohibiting future contact. Shortly after the injunction was issued, Davis followed the victim and another individual, revving his engine and pulling his vehicle close to their car. The victim reported the incident to the sheriff's office. Nine days later, Davis again followed the victim, revving his engine, pulling close behind her, and then backing off; at one point he cut her off and forced her to slam on brakes to avoid hitting him. This incident was also reported to the police. Davis was subsequently arrested for violating the injunction.
Six months later, Davis again followed the victim, revving his engine, driving close behind her and beeping his horn. Again, she contacted the police, stating she was very frightened. Approximately one month later, the victim saw Davis. She stopped and telephoned her boyfriend, who worked for the St. Petersburg Beach Police Department, and she requested that some officers meet her at the bridge. The victim observed Davis behind her when she stopped at the toll booth entrance to the bridge. While the victim was attempting to cross the bridge, Davis pulled up close to her, began beeping his horn, and waved a gun out the window. She began to drive erratically at high speeds to deter him from shooting her. She tapped on her brakes and Davis smashed into her vehicle. The victim lost control of the vehicle and smashed into cement dividers.
After this incident, the victim was interviewed by several reporters, one of whom was Mason. Based on the interview, Mason authored the news story "No Way Out," in which she wrote: "She knew she was going to have to slow down for the single lane. She tapped her brakes lightly, hoping the brake light would make Davis back off. He stayed right on her tail, she says. She stepped on her brakes."
Prior to trial, Davis sought to elicit Mason's testimony about the victim's statements to show that the victim intentionally stepped on her brakes, which he asserts would assist in negating Davis's specific intent to do violence to the victim.
At trial, the victim testified that the defendant was so close to her that she could not see his headlights. She stated that she knew she had to slow down, so she tapped on the brakes so her lights would go on and so Davis would know to back off and get away from her car. Consistent with statements in the news article, she stated "I tapped on the brakes and he smashed into my car." She also admitted to entering into a "cat and mouse" situation with Davis. She additionally testified: "Of course I didn't want the accident to occur. I was trying to get away. I was trying to get to St. Pete so I could call the police."
In essence, the statements in the article are consistent with the victim's own statements at trial. Further, in no way did she *230 indicate in statements in the article or at trial that she intentionally caused the accident.
Given all the circumstances in this record, we find that any error of the trial judge in applying a qualified privilege for this reporter's testimony was harmless error. Even assuming, arguendo, that Mason would have testified that the victim told her she intentionally caused the accident, that information would not be sufficient to warrant a new trial; the evidence would still support a finding that Davis intentionally threatened the victim by chasing and harassing her with his vehicle and placed her in fear of imminent harm. Consequently, we find that there is no reasonable possibility that the error contributed to the conviction. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Accordingly, we answer the certified question in the affirmative, and we find that Davis's conviction and sentence should be affirmed. Consequently, we quash the decision of the district court, and we direct that the conviction and sentence be reinstated.
It is so ordered.
HARDING, C.J., and SHAW and ANSTEAD, JJ., concur.
KOGAN, J., concurs in result only.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Justice, concurring and dissenting.
I concur in the result reached by the majority.
I concur that the balancing test should be applied on a case-by-case basis to both confidential and nonconfidential information gathered by a professional news gatherer within the scope of his or her work. I also concur that the privilege does not apply to eyewitness observations or to providing the material which was the subject of this Court's decision in CBS, Inc. v. Jackson, 578 So.2d 698 (Fla.1991).
I dissent from the specific language of the opinion which states:
When determining the compelling need of a defendant, ... [a court] also must factor into the equation the federal and Florida constitutional rights to compulsory and due process so as to ensure that the defendant receives a fair trial.
The meaning and intended effect of this statement lacks clarity to me when applied to the balancing test. I am very concerned that this language will lead to confusion in the application of the test. I am also concerned that this language will unnecessarily and unduly burden newsgatherers in their work because many attempts to obtain the work product of newsgatherers are likely to be generated to test the breadth of what appears may be an additional factor in the balancing test. I believe it would be preferable to simply hold that a balancing test is to be used as set forth in the newly enacted statute.
Finally, based upon the trial court's application of the balancing test, it is my conclusion that the trial judge in this case did not err.
NOTES
[1] Apparently, Davis never called this "other witness" to testify to this information at trial.
[2] At the time Branzburg was decided, seventeen states had shield laws. James C. Goodale & John S. Kiernan, Reporter's Privilege, Practising Law Institute, PLI Order No. G4-3980 (1996).
[3] By 1996, the following twenty-nine states had adopted such laws: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, District of Columbia, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, and Tennessee. Id.
[4] During the past legislative session, Florida enacted a "Journalist's Privilege," which became effective upon becoming law on May 12, 1998. See Ch. 98-48, Laws of Fla. Because the incident in this case occurred before the effective date of the new law, we find it necessary to address the issue before us.
[5] See Appeal of Goodfader, 45 Haw. 317, 367 P.2d 472 (1961).
[6] Coleman v. State, 966 S.W.2d 525, 526 n. 5 (Tex.Crim.App.1998); State ex rel. Healey v. McMeans, 884 S.W.2d 772 (Tex.Crim.App.1994).
[7] See Denk v. Iowa District Court, 20 Media L. Rptr. 1454 (Iowa 1992).
[8] See State v. Salsbury, 129 Idaho 307, 924 P.2d 208 (1996); State v. Sandstrom, 224 Kan. 573, 581 P.2d 812 (1978); Medlin v. Bettis Asphalt & Constr., 17 Media L. Rptr. 1783 (Kan.Dist.Ct. 1990); State v. Hohler, 543 A.2d 364 (Me. 1988); Promulgation of Rules Regarding the Protection of Confidential News Sources, 395 Mass. 164, 479 N.E.2d 154 (1985) (declining to adopt rule implementing privilege but acknowledging that limited privilege exists); State ex rel. Classic III Inc. v. Ely, 954 S.W.2d 650 (Mo.Ct.App.1997); State v. Siel, 122 N.H. 254, 444 A.2d 499 (1982); State v. Wallace, 23 Media L. Rptr. 1473 (N.C.Super.Ct. 1995); Hopewell v. Midcontinent Broadcasting Corp., 538 N.W.2d 780 (S.D.1995), cert. denied, ___ U.S. ___, 117 S.Ct. 69, 136 L.Ed.2d 30 (1996); State v. Blais, 6 Media L. Rptr. 1537 (Vt.Dist.Ct.1980), but see State v. Gundlah ex rel. Smallheer, 160 Vt. 193, 624 A.2d 368 (1993) (acknowledging that law in this area is not clearly defined); Brown v. Commonwealth, 214 Va. 755, 204 S.E.2d 429 (1974); Senear v. Daily Journal-American, 97 Wash.2d 148, 641 P.2d 1180 (1982); State ex rel. Hudok v. Henry, 182 W.Va. 500, 389 S.E.2d 188 (1989); Zelenka v. State, 83 Wis.2d 601, 266 N.W.2d 279 (1978).